WENDOLIN GERWICK V. STATE OF NEBRASKA.

FILED MARCH 13, 1915.   No. 18929.

1. **Criminal Law:** APPEAL: FINDINGS: EVIDENCE. Where a jury has decided a question of fact properly submitted, and the trial judge has overruled a motion for a new trial, if the record discloses competent evidence on which the finding is based, such finding should not be disturbed by the supreme court, unless upon the whole record it is clearly wrong.

2. **Assault and Battery:** SUFFICIENCY OF EVIDENCE. The evidence examined, and *held* sufficient to sustain the verdict.

ERROR to the district court for Richardson county: JOHN B. RAPER, JUDGE. *Affirmed.*

*H. A. Lambert* and *Edwin Falloon,* for plaintiff in error.

*Willis E. Reed, Attorney General,* and *C. F. Reavis, contra.*

HAMER, J.

The plaintiff in error, Wendolin Gerwick, and hereafter called the defendant, was on the 11th day of November, 1913, charged with making an assault upon Clifford Duerfeldt.   The complaint was filed in the office of John D. Spragins, a justice of the peace of Richardson county, where the defendant was found guilty.   He appealed to the district court for Richardson county, where, on the 26th day of February, 1914, he was tried on the original charge before Judge Raper and a jury, and was again convicted.   He was sentenced to pay a fine of $20 and costs. The case comes here on a petition in error.

It is strenuously contended that the evidence is insufficient to sustain the verdict, and that the verdict is the result of bias and prejudice on the part of the jury.

Clifford Duerfeldt was a boy between 15 and 16 years old. He went with his father, Gus Duerfeldt, and William Rusch to the farm of the defendant Wendolin Gerwick. The father and his son and the hired man were looking for a hog which had strayed from the Duerfeldt premises and was supposed to be on the Gerwick farm. The Gerwick and Duerfeldt places are adjoining farms. The evidence shows ill will between the elder Duerfeldt and the defendant. On the day in question, when the Duerfeldts and the hired man, Rusch, reached the fence between the farms, the elder Duerfeldt and Rusch stopped at the fence, and the boy went inside of the fence a few rods until he reached the defendant's hog house. Gerwick and his two daughters were at work in the hog house separating sows and pigs and shutting them up in separate pens.

The boy testified: "Q. After you got to the fence that marked the beginning of the Gerwick land, who, if any one, went from the fence toward the Gerwick house? A. I did. Q. Where did you go? A. North, towards the house. Q. What were you going for? A. To ask where our hog was? * * * Q. When you got to the hog house, what happened? A. He was in the hog house when I got there. Q. Who? A. Mr. Gerwick. Q. Wendolin Gerwick? A. Yes, sir; and he asked, 'What are you doing here?' I said, I wanted to know where the hog was at, and he said, 'You damn thief,' and he hit me over the head, and I run. Q. What did he hit you with? A. A club, like a broomstick. Q. Which way did you run? A. South. Q. What did you do, if anything, toward screaming or making a noise? A. I cried. Q. What did your father and the hired man do? A. They asked, and I told them. Q. What did they do, stand by the fence or go over? A. They came and got me. Q. How close were you to the fence? A. Half way between the hog house and the fence. Q. When they spoke to you what did you say? A. I said, 'They hit me on the head.' * * * Where was Gerwick when you were run-

ning away?  A.  He came out of the hog house.  Q.  What
did he have in his hand?  A.  A club.  Q.  What did you do
when your father and the hired man came to you, if any-
thing?  A.  He cussed all he could."  (It is unnecessary
to recite the abusive and vulgar language used.  We will
therefore omit it.)  "Q.  On what portion of your body did
Gerwick strike you with a club?  A.  On the left side of
my head.  Q.  What effect, if any, did that have on the left
side of your head?  A.  I had a lump there over two
months."  The boy testified that the lump was as big as a
hen's egg, but he probably exaggerated it, because the
other witnesses testified that it was about half as big as a
hen's egg.

A photograph of the south and north ends of the hog
house was taken and was introduced in evidence by the
defendant.  The south end shows a window or opening.
The heads of the two daughters of the defendant are shown
at this opening.  There seems to have been an impression
that there was a door there, instead of a window, and the
witnesses testified that the defendant came out through
that door.  He could not have come through the door in
the natural way.  Of course, he could have jumped out
of the window, but he could not have walked out of it.
There was a door in the north end of the hog house.  It
was a double door, but if the defendant came out of that
door he would necessarily be compelled to walk around
the hog house to the south and before he would be visible
there.  The defendant contends that the boy and his fa-
ther and the hired man were mistaken as to whether the
defendant walked out of the door and then hit the boy
with the stick.  The witnesses all agree that the boy was
hurt.  He had a lump on his head.  He ran toward his
father crying.  It is immaterial whether the defendant
reached out of that window and hit the boy over the head
or whether he came out of the north door and went around
to the south end and then struck him.  The main question
is did he strike him.  This question was submitted to a
jury under instructions which do not seem to be objection-

able in any way.   Apparently the defendant had a fair trial and was properly convicted by sufficient evidence.

Counsel for the defendant make a vigorous contention in their brief that the evidence tending to show that there was bad blood between the defendant and Duerfeldt was objectionable and prejudicial.   There is evidence that the defendant threatened Gus Duerfeldt, and said to him, "I will get you yet;" that when he did this he held a club over the elder Duerfeldt's head; that some two years before that the defendant had said, "I will get you one time or the other," and at that time he was threatening the elder Duerfeldt with a club.   It is claimed that this sort of evidence was likely to inflame the minds of the jurors and to make them accept the view that the defendant had actually struck the boy with the club as charged.   There can be no question under the evidence that there was ill will between these people.

Clifford Duerfeldt testified at one time in his evidence that the defendant stuck a stick out of the door first and then struck him.   Of course, he might have stuck the stick out of the window, and could then have hit the boy, if he was standing by the window.   We do not have to determine the question of fact.   That was determined by the jury.   They heard the evidence and saw the witnesses. After hearing the evidence they could not well have been in doubt that the boy was struck.   He was struck on the head and rather severely injured.   In his normal condition the defendant is probably ashamed of what he did, and perhaps regrets it, but the evidence fully justifies the verdict, and we are unable to discover any reason for setting it aside.   It should be remembered that, when a motion for a new trial was heard, the question was submitted to the court as to whether the evidence sustained the verdict. The supreme court is reluctant to order a reversal where there is evidence which tends to sustain the verdict.   When the jury has decided a question of fact properly submitted, and the trial judge has overruled a motion for a new trial, then, if the record discloses competent evidence on which the finding may have been based, such finding should not

be disturbed by the supreme court, unless upon the whole record the verdict is clearly wrong. We have examined the bill of exceptions and find the evidence sustains the verdict.

The judgment of the district court is

AFFIRMED.

LETTON and FAWCETT, JJ., not sitting.